**Daniela TURACOVA, M.D.**

v.

**Patricia DeTHOMAS, Administratrix of the Estate of Ronald DeThomas, et al.**

No. 2010–385–Appeal.

Supreme Court of Rhode Island.

June 14, 2012.

Steven A. Robinson, Esq., Cranston, for Plaintiff.

Kevin F. Bowen, Esq., Providence, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice GOLDBERG, for the Court.

This case came before the Supreme Court on January 26, 2012, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided. The plaintiff, Daniela Turacova, M.D. (plaintiff or Turacova), is before us on appeal from a Superior Court judgment in favor of the defendant and counterclaimant, Patricia DeThomas, administratrix of the estate of Ronald DeThomas (defendant or the estate), in the amount of $658,573.28, including prejudgment interest. On appeal, the plaintiff contends that the trial justice erred in disregarding the parties' agreement that payment for DeThomas's interest in an entity known as Taunton Avenue Medical Associates, LLC (TAMA) was due within thirty days from the trial court's determination of the purchase price. The plaintiff also argues that the trial justice erred in entering judgment

and awarding prejudgment interest to the defendant when there was no money judgment and no breach of contract action before the court. Lastly, the plaintiff argues that the trial court erred in determining that the TAMA operating agreement (operating agreement) executed by the parties contemplated that interest would run at the statutory rate beyond the three-month buyout period set forth in the agreement.

Having carefully reviewed the memoranda submitted by the parties and the arguments of counsel, we are satisfied that cause has not been shown; thus, the appeal may be decided at this time. For the reasons below, we affirm the judgment of the Superior Court.

### Facts and Travel

On February 2, 2006, Turacova and Ronald DeThomas (DeThomas) formed a limited liability company, known as TAMA, to acquire and manage property located in East Providence, Rhode Island. Turacova and DeThomas were the only organizing members of TAMA. The parties executed the operating agreement on March 9, 2006, setting forth the terms of their arrangement with respect to TAMA. The property in East Providence housed medical offices and was the site of the East Providence Medical Center (EPMC), a walk-in, emergent care medical facility.[1]

A dispute arose between Turacova and DeThomas in June or July of 2006 regarding the EPMC shareholder's agreement. The dispute concerned an alleged promise by DeThomas to provide Turacova with $100,000 for the purchase of 400 shares of EPMC stock. Turacova brought suit against DeThomas, alleging misrepresentation and fraud in connection with the purchase of EPMC shares. Turacova asserted that she had purchased two-thirds of the outstanding shares, while DeThomas asserted that she had purchased only half of the shares, making them co-owners of all shares. On March 22, 2008, while the EPMC litigation was pending, DeThomas passed away. After his death, the parties entered into a settlement agreement (settlement agreement) on January 9, 2009, whereby they resolved their dispute concerning the fraud and misrepresentation connected with Turacova's purchase of DeThomas's EPMC shares. Turacova purchased DeThomas's shares in EPMC in conformity with the formula set forth in the EPMC shareholder's agreement and at a purchase price specified in the settlement agreement.[2]

DeThomas's death also gave rise to a new issue regarding the buyout of his interest in TAMA. The TAMA operating agreement provided that in the event of the death of one member, the remaining member or members "shall, upon the date not more than three (3) months after the date of [m]ember's death, purchase and * * * the [administrator] shall sell the Membership Interests of the deceased [m]ember to the remaining [m]ember(s) at the purchase price as defined in Section 8.4." The settlement agreement that the parties entered into, resolving the EPMC share dispute, also provided language setting forth the manner in which the TAMA purchase was to occur.

The settlement agreement was preceded by a series of discussions focused on effec-

---

1. Before TAMA was organized, the parties entered into an agreement relative to EPMC (EPMC shareholder's agreement).

2. The settlement agreement provided that the estate agreed to sell, and EPMC agreed to purchase, all shares of stock owned by DeThomas as of the date of his death. In consideration of that purchase, Turacova agreed to pay $105,194.

tuating Turacova's purchase of DeThomas's interest in TAMA. The discussions regarding this purchase were conducted through the parties' respective counsel. The attorneys discussed the joint selection of a real estate appraiser to appraise the TAMA property, in accordance with the provisions of the operating agreement. On April 2, 2008, several appraisers were considered for selection by the parties, including Thomas Andolfo (Andolfo), Paul Bordieri (Bordieri), and Peter M. Scotti & Associates (Scotti & Associates). On April 18, 2008, the parties jointly agreed to retain Andolfo to appraise the property. Several weeks later, however, counsel for Turacova advised the estate that his client was withdrawing from the agreement to retain Andolfo as the appraiser. The plaintiffs counsel then conveyed an offer to the estate, proposing to purchase DeThomas's interest in TAMA for $475,000. At the same time, plaintiffs counsel notified counsel for the estate that he had faxed a request to Scotti & Associates soliciting a bid to perform the appraisal on the property. The estate never received a bid from Scotti & Associates, nor did the estate ever consent to commissioning Scotti & Associates to conduct the appraisal.[3] Scotti & Associates nonetheless performed an appraisal, dated June 20, 2008, that indicated a value of $930,000 for the realty.

The estate rejected Turacova's offer to purchase for $475,000. Counsel for the estate then advised plaintiff that time was of the essence with respect to the buyout of DeThomas's interest in TAMA, in accordance with the provisions of the operating agreement. The estate then retained Robert Bargamian (Bargamian) to appraise the TAMA real estate. Bargamian appraised the property at $1,325,000, as of July 24, 2008.

It was in the aftermath of these disputes that the parties entered into the aforementioned settlement agreement, setting forth that the purchase price for DeThomas's 50 percent interest in TAMA would be established either by agreement of the parties or, failing that, it would be determined by a justice of the Superior Court. The settlement agreement also provided that in the event a justice of the Superior Court determined the fair market value of the property, the justice also would be asked to construe several provisions of the TAMA operating agreement in order to fix the total amount that Turacova owed to the estate. The trial justice was to consider the allocation of income earned by TAMA after DeThomas's death, whether the term "property" in the agreement encompassed non-real estate property, and the effect, if any, of the delay in payment of the purchase price beyond the three-month period set forth in the operating agreement. Both parties specifically waived the right to appeal the trial justice's decision with respect to the determination of value.

A hearing commenced on February 2, 2009, before a justice of the Superior Court. The plaintiff presented the testimony of Peter Scotti (Scotti) of Scotti & Associates, a real estate appraiser who valued the property in question at $930,000. The defendant presented the testimony of Bargamian, who appraised the real estate at $1,325,000. The parties also filed stipulations concerning their discussions about selecting an appraiser to value the property, notwithstanding their inability to come to a meeting of the minds on this issue.

3. The parties stipulated that the estate was not billed for any portion of the appraisal, and the record reflects that the report from Scotti & Associates was prepared at the request of Turacova's attorney.

At the conclusion of the hearing, the parties filed amended pleadings. The plaintiff filed a third amended complaint, containing two counts. Count 1 requested a declaratory judgment that: (1) the estate was not entitled to the award of any income from TAMA; (2) the estate was not entitled any interest or penalties beyond the payment of one-half of the fair market value of the property; (3) the estate was not entitled to any distributions from TAMA after the death of DeThomas; (4) the trial justice was to determine the fair market value of the property; and (5) the trial justice was to find and declare that the settlement agreement modified the operating agreement concerning the three-month period in which the estate was required to sell and plaintiff was required to buy the decedent's interest in TAMA. In Count 2, plaintiff sought specific performance finding that the fair market value of the property was $930,000, thus requiring the estate to convey DeThomas's interest in the property for $465,000.

Significantly for our purposes, defendant's two-count counterclaim was for breach of contract, including a claim that Turacova breached the terms of the operating agreement by failing to select a mutually agreed upon appraiser and by failing to purchase DeThomas's interest in TAMA within the three-month period specified in the operating agreement. The defendant also alleged that plaintiff breached the terms of the operating agreement by refusing to include non-real property in establishing the purchase price and by failing to distribute any of TAMA's funds to the estate. The defendant sought a judicial determination that the fair market value of the property was $1,325,000, a declaration that provisions of the operating agreement required that all property of TAMA—including non-real estate property—be included in the valuation, and a

finding that Turacova breached the contract.

Further argument was presented to the Superior Court trial justice on November 4, 2009. After reviewing the testimony, exhibits, memoranda, and arguments, the trial justice rendered a bench decision on February 5, 2010. In a Solomonic ruling, the trial justice concluded that the property's fair market value was $1,100,000, noting that he was "satisfied that the plaintiff's appraisal was low, and * * * that the estate's appraisal is high." Accordingly, the trial justice concluded that the value of the estate's interest in the real estate was $550,000.

The trial justice then turned to the remaining issues before him. He declared that, pursuant to the operating agreement, the estate was not entitled to a distribution of income after the death of the decedent. The trial justice also concluded that the term "property" in the operating agreement referred to "all property, [including] real, personal, and mixed, and not just the LLC's real estate." Lastly, the trial justice declared that the estate was entitled to collect prejudgment interest on the amount owed by Turacova. He found that Turacova breached the terms of the operating agreement when she withdrew her consent to the engagement of a mutually acceptable appraiser, and that she was responsible for a substantial delay in the performance of the operating agreement. The trial justice also declared that the "parties clearly contemplated that something would occur following the conclusion of the three-month period." That occurrence, the trial justice found was "the imposition of interest from that point to the time of payment."

The record discloses that several documents entitled "Judgment" entered in this case. The plaintiff did not file an appeal from the first "Judgment," but filed a mo-

tion for reconsideration on April 28, 2010.[4] The plaintiff argued, pursuant to Rule 60(b)(6) of the Superior Court Rules of Civil Procedure, that the trial justice should reconsider the award of prejudgment interest. The defendant filed an objection to plaintiff's motion, and the trial justice heard the motion on May 28, 2010. At the hearing, plaintiff argued that judgment had not yet entered in the case and that the trial justice should reconsider his decision with respect to prejudgment interest. Finding "no unique circumstances and no manifest injustice," the trial justice denied the motion for reconsideration, concluding that the decision was appropriate under all the circumstances. A judgment in the amount of $658,573.28, including prejudgment interest, entered against plaintiff on June 1, 2010, and an order denying plaintiff's motion for reconsideration entered on June 4, 2010. The plaintiff appealed.

## Standard of Review

■ It is well-settled that "[a] Rule 60(b) motion to vacate is addressed to the trial justice's sound judicial discretion and 'will not be disturbed on appeal, absent a showing of abuse of discretion.'" *Yi Gu v. Rhode Island Public Transit Authority*, 38 A.3d 1093, 1099 (R.I.2012) (quoting *School Committee of Cranston v. Bergin–Andrews*, 984 A.2d 629, 649 (R.I.2009)).

---

4. The plaintiff acknowledged in her motion that the Superior Court Rules of Civil Procedure do not provide for motions for reconsideration, but that such motions may be treated as motions to vacate under Rule 60(b) of the Superior Court Rules of Civil Procedure.

5. The March 1 and March 9, 2010 "Judgments" contained identical language, including that the court determined the value of the real estate property to be $1,100,000 and that the stipulated value of the non-real property was $823.21. The final sentence stated, "The Clerk shall calculate prejudgment interest on

## Analysis

### The Judgments and the Motion to Reconsider

The record before us discloses that a document labeled "Judgment" was signed by the trial justice on March 1, 2010; this document sets forth, *inter alia*, the trial justice's finding on the value of the real estate and directs the clerk to calculate prejudgment interest on the amount beginning on June 20, 2008, although the amount of interest is not specified in the document.[5] Additionally, the Superior Court file contains an identical document, also entitled "Judgment," signed by the trial justice and the clerk of the court on March 9, 2010. The plaintiff did not appeal from the first "Judgment," but filed a motion for reconsideration with the trial court on April 28, 2010. A judgment in the amount of $658,573.28, including prejudgment interest, entered on June 1, 2010,[6] and an order entered denying plaintiff's motion for reconsideration on June 4, 2010. The plaintiff filed a notice of appeal on June 25, 2010. The confusing record in this case, and the fact that there were two documents entitled "Judgment" entered in March 2010, raises the threshold question of whether this appeal was filed on a timely basis.

■ The trial courts' *ad hoc* practice of entertaining a party's motion to recon-

---

the judgment herein rendered as commencing on June 20, 2008." To add to this confusion, the Superior Court docket sheet contains three entries indicating that "Judgment" was entered—two entries are dated March 1, 2010, and the third entry is dated March 9, 2010.

6. Further confusion is caused by the fact that the docket sheet reflects two entries of "Judgment" in favor of defendant for the total sum of $658,573.28, inclusive of the prejudgment interest amounts—one judgment entered on June 1, 2010 and the second on June 9, 2010.

sider has been treated by this Court as a motion to vacate a judgment under Rule 60(b).[7] *See Bergin–Andrews*, 984 A.2d at 649 (noting that this Court traditionally has allowed motions to reconsider to be treated as motions to vacate under Rule 60(b)). However, Rule 60(b) generally is available "in instances where relief is sought from a final judgment, order, or proceeding." *Murphy v. Bocchio*, 114 R.I. 679, 682, 338 A.2d 519, 522 (1975). Neither a Rule 60 motion nor a motion to reconsider may serve as a substitute for a party's failure to file a timely appeal. *See Gray v. Stillman White Co.*, 522 A.2d 737, 740 (R.I.1987) (citing *Town of Hopkinton v. Keiser*, 122 R.I. 524, 528–29, 409 A.2d 1220, 1223 (1980)). Further, a motion filed under Rule 60(b) does not affect the finality of a judgment or suspend its operation. In the event that a valid, un-appealed judgment has entered, it may be vacated pursuant to Rule 60(b) for the specific reasons set forth in the rule and will not operate to revive an otherwise moribund appeal. We take this opportunity to direct that the time constraints for the taking of an appeal and for seeking relief under Rule 60 be strictly followed. We have

declared that the twenty-day period for commencing an appeal begins to run from the first day after the entry of a valid, appealable order or judgment. *Malinou v. Seattle Savings Bank*, 970 A.2d 6, 10 (R.I.2009) (citing *Kay v. Menard*, 727 A.2d 665, 666 (R.I.1999)). In the event that multiple judgments have entered on a single issue, "the time for appeal begins to run from the first day after the first valid judgment is entered." Robert B. Kent et al., *Rhode Island Civil and Appellate Procedure* § 58:2 (2011).

■ In the case before us, the record indicates that neither the parties, nor the trial justice, considered the documents entered on March 1, 2010 and March 9, 2010 to be final judgments. Our review of the hearing transcript discloses that the trial justice anticipated that the parties would draft language for a proposed order and come before him once more for entry of a mutually agreed upon order.[8] Thus, we are satisfied that the March 2010 documents were not final because the mutually agreed upon order never was presented to the court. Moreover, although entitled

7. Rule 60(b) of the Superior Court of Civil Procedure provides in pertinent part:

"On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud * * *, misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion

shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken. A motion under this subdivision (b) does not affect the finality of a judgment or suspend its operation. This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or to set aside a judgment for fraud upon the court."

8. The trial justice directed,

"What the Court is going to do * * * is basically direct that you folks sit down, see if you can come to an agreed order for the Court to enter. If you can, so be it. If you cannot, the Court will receive two weeks from today * * * competing orders * * * filed with the Court, if you do not have an agreed order * * *."

"Judgment," these documents failed to set forth the total monetary award, including interest and costs. Accordingly, we deem the operable judgment to be that which was entered by the clerk of the court on June 1, 2010, setting forth the total amount plaintiff owed defendant—inclusive of the statutory prejudgment interest. We shall proceed to address the substantive issues raised by plaintiff in this case.

### The Settlement Agreement Does Not Supersede the Operating Agreement

On appeal, plaintiff contends that the trial justice erred in disregarding language in the settlement agreement indicating that plaintiff would have thirty days from the date the value of the real estate was determined in which to pay defendant. The plaintiff argues that this clause in the settlement agreement supersedes the provision in the operating agreement concerning the time for payment. The defendant counters that the settlement agreement does not override the operating agreement and that the purpose of the thirty-day provision in the settlement agreement was to set forth a time frame within which payment on the judgment would be made because the parties had agreed that the trial justice's determination of the property's value would be final.

We agree with defendant and note that the provisions of the operating agreement controlled several aspects of the trial justice's decision, including whether the estate was entitled to any distributions of income after the death of the decedent—it was not—and that the meaning of the term "property" as set forth in Article VIII, § 8.4 of the operating agreement included all property of every kind. Consistent with the parties' request that the trial justice address the numerous issues in dispute between them, the court looked to the operating agreement and declared that it was the controlling document. Under Article VIII, § 8.2(b) of the operating agreement, the buyout of DeThomas's interest was to occur within three months of his death. The trial justice found that plaintiff breached the provisions of the governing document—the operating agreement—when she withdrew her consent to the engagement of a mutually acceptable appraiser and that this caused a substantial delay in the process.

■ After careful review of the operating agreement and the settlement agreement, we are of the opinion that the settlement agreement does not supplant the provisions of the operating agreement. The settlement agreement explicitly requests that a trial justice of the Superior Court consider the effect of plaintiff's delay in complying with the three-month buyout provision in the operating agreement in determining the amount owed to the estate. Thus, plaintiffs suggestion that the trial justice exceeded his authority by doing that which the parties requested is without merit.

### The Award of Prejudgment Interest

■ Turacova next challenges the award of prejudgment interest in this case on several, somewhat overlapping, grounds. She contends that prejudgment interest should not have been imposed because the relief sought was essentially declaratory in nature, because the trial justice was asked to determine the value of the TAMA property, and because no damages were awarded. The plaintiff cites to *Fravala v. City of Cranston,* 996 A.2d 696, 707–08 (R.I.2010), in which this Court held that the plaintiff was not entitled to prejudgment interest because she had agreed to dismiss her breach of contract claim and proceeded on her declaratory judgment claim. Turacova contends that because

there was no viable breach of contract cause of action against her, no prejudgment interest should have been awarded. The plaintiff is mistaken. First, in its post-hearing amended complaint, the estate included two counts for breach of contract, and the trial justice specifically found that plaintiff violated the provisions of the operating agreement when she withdrew her consent to the selection of the appraiser and caused the delay in performance. Accordingly, because there were breach of contract claims before the trial justice and plaintiff was found to have breached the terms of the operating agreement, the imposition of prejudgment interest was appropriate.[9]

 Furthermore, to the extent that plaintiff contends that she did not breach the terms of the operating agreement, we reject her argument. Whether a party has breached a contract is a question of fact. *Parker v. Byrne,* 996 A.2d 627, 632 (R.I.2010) (citing *Women's Development Corp. v. City of Central Falls,* 764 A.2d 151, 158 (R.I.2001)). The factual findings of a trial justice sitting without a jury are entitled to great weight and will not be disturbed on appeal unless clearly wrong. *Fisher v. Applebaum,* 947 A.2d 248, 251 (R.I.2008) (citing *Burke–Tarr Co. v. Ferland Corp.,* 724 A.2d 1014, 1018 (R.I. 1999)). We perceive no error in the trial justice's finding that plaintiff in this case breached the contract by failing to perform according to its terms.

Third, the plaintiff avers that the trial justice erred in interpreting the operating agreement as contemplating the award of

prejudgment interest. This contention equally is without merit. The trial justice found that the provision of the operating agreement requiring that the distribution of income from TAMA terminate upon the death of a member, coupled with the mandate for a three-month buyout of the member's interest, "clearly contemplated that something would occur following the conclusion of the three-month period." The trial justice concluded that the imposition of interest from that point was the resulting consequence. We discern no error in that conclusion. The fact that the parties entered into a settlement in a lawsuit that was pending at the time DeThomas died and that concerned claims unrelated to the provisions of the operating agreement is of no consequence, save for the gracious acquiescence by the trial justice to entertain the parties' request to determine the value of the property and address their concerns. The estate could have filed suit against the plaintiff at any time after the three-month buyout period. The fact that the parties attempted to reach a settlement of the issues between them does not relieve the plaintiff of responsibility for the payment of prejudgment interest.

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The papers in this case may be returned to the Superior Court.

---

9. General Laws 1956 § 9–21–10(a) sets forth in relevant part:
 "In any civil action in which a verdict is rendered or a decision made for pecuniary damages, there shall be added by the clerk of the court to the amount of damages interest at the rate of twelve percent (12%) per annum thereon from the date the cause of action accrued, which shall be included in the judgment entered therein. * * * This section shall not apply until entry of judgment or to any contractual obligation where interest is already provided."